**STATE, Plaintiff-Appellee, v. JOHNSON, Defendant-Appellant.**

Ohio Appeals, Second District, Montgomery County.

No. 2093. Decided May 5, 1950.

Mathias H. Heck, Pros. Atty., William H. Wolff and Lloyd H. O'Hara, Asst. Pros. Attys., Dayton, for plaintiff-appellee.

Jacobson & Durst, Dayton, for defendant-appellant.

## OPINION

By HORNBECK, J:

The defendant was indicted, tried before a court consisting of three judges, convicted and sentenced for the offense of assault with intent to rape. A jury had been waived in writing.

The prosecuting witness was Annie Rose and the offense was alleged to have been committed on May 24, 1949. The defendant gave notice according to law that he would assert a defense of alibi "at the claimed time of the alleged occurrence of the matter mentioned in the indictment herein that he was enroute from west side of Dayton toward the southeast end of Dayton, Ohio."

The prosecuting witness was a married woman, mother of two children and living with her husband at 4202 Cleveland Avenue, City of Dayton. She testified fully as to the claimed assault and was corroborated, in particulars, by other witnesses. We discuss the testimony more at length hereafter.

Appellant assigns five errors.

1 and 2. The judgment is not sustained by sufficient evidence and is contrary to the weight of the evidence.

3. The court erred in overruling the motion of the defendant to require the plaintiff to grant to him in advance of the trial the right to inspect and make a copy of a statement taken from him by the Police Department of the City of Dayton, Ohio, on or about May 26, 1949.

4. The court erred in the rejection of evidence offered by the defendant.

5. The court erred in admitting certain evidence offered by the State of Ohio to which the defendant objected.

The last error assigned is not discussed in the brief of appellant.

The fourth assignment of error. Defendant offered Mr. Otto Morganthal in his behalf, who testified at some length. The prosecuting witness was a niece of the wife of Mr. Morganthal. He said that he had known her since 1924, that he had seen her occasionally in past years, and without further development this question was asked. "I will ask you whether or not you would believe her under oath?" Upon objection this question was then propounded: "Will you tell us the reputation of this young lady for truth and veracity?"

Upon objection the court called counsel's attention to the fact that no foundation had properly been laid to support the question. Without further development inquiry again was made, "Do you know her reputation for truth and veracity?" The witness said, "Since she came into this country. The fact is we sent tickets to come here." Upon the inquiry, if he had seen the prosecuting witness in the last ten years, he said, "Well, she grows up like all American kids." An effort was made to learn how well the witness knew the prosecuting witness without success. There was again the question touching the credibility of the prosecuting witness. The court refused to permit the witness to answer.

We are satisfied that the ruling of the court was correct. The purpose of such testimony is to prove general reputation or character. It is not to elicit the personal opinion of the witness but his conclusion as to the reputation of the person sought to be impeached in the community in which he or she resides. The foundation question which is recognized by lawyers and the courts is intended to elicit an answer which will determine whether or not the witness is qualified to testify on the subject. At no time was a question propounded nor did the evidence develop facts from which the trial court could conclude that the witness had the qualifications prerequisite to testifying as to the credibility of the prosecuting witness.

The third assignment is based upon the overruling of the motion of defendant seeking an order granting him the right to inspect and to make a copy of a statement taken from him by the Police Department of the City of Dayton. The statement was not offered by the State. The §§11551 and 11552 GC define the rights of a party to books or writings in the hands of the other party and the necessary steps to be taken to secure them. **State v. Hahn, 10 O. O. 29,** holds that §11552 GC has no application to a a criminal case and in **State v. Yeoman, 112 Oh St 214,** it is said that defendant may not compel the prosecuting attorney to submit to him, or his counsel, a written confession signed by the defendant, either under §11552 or §13664 GC, now §13444-6 GC.

The first and second assignments of error are made the subject of an extended brief of appellant wherein is discussed the testimony of the witnesses, attention directed to the conflicts in the evidence and insistence made that it does not support the findings and judgment.

In this case, as in most trials, there are discrepancies in the testimony, differences in detailing the facts and variations as to the time when relevant events occurred from all

of which the triers of the facts were required to determine the ultimate issue.

The prosecuting witness testified that she left her home about noon on the 24th of May and with Mrs. Elsie Hafner and Mrs. Morganthal went down town in the City of Dayton to shop and that she returned to her home about one o'clock P. M. She further states that her daughter, who had been at home during her mother's absence, soon left for school; that sometime thereafter, around one-thirty o'clock, the defendant came into her home and into the bathroom where she was seated on the commode; that she told him to leave, got up, put on a robe and stepped into the hall, whereupon, after some insulting remarks, he grabbed her and forced her into an adjoining bedroom where he attacked her and attempted to have intercourse with her. She says that she screamed several times but that he held his hand over her mouth and nose and attempted to stifle her screams and forced her to the floor and that she had great difficulty in breathing. She describes the assault and says that her lips and nose were badly swollen, or at least felt like they were swollen, that she had marks on her face, that her breasts were beaten, that she had friction burns on her back and was bruised on her thighs. She says that defendant threatened to kill her, says that she threatened to call the police and the defendant said if she did he would lie about it and would say that he had not been there. She fixes her movements after the assault and states that she then called, first, the home of Mrs. Hafner. The line was busy. She then called Mrs. Morganthal. Her line was busy. She then called Mrs. Hafner again and her line was still busy and upon a second call to Mrs. Morganthal, the defendant answered the phone and she hung up without saying anything to him. She says that she made these calls within five minutes after the attack. She finally reached Joseph Hafner, the husband of Elsie Hafner, at the place where he worked and told him what had occurred. He picked up her husband and they went to his home. After about a half an hour the police were called. She states that several times during the assault she blackened out temporarily, caused by the attack and particularly by the holding of defendant's hand over her nose and mouth. She also testifies that she had been sick for some time and in this she is corroborated by her husband, from which it may be inferred that she was not physically fit to make a successful defense against the attack.

The alibi by the defendant is to the effect that he was

enroute from the west side of Dayton to the southeast side of Dayton when the attack occurred.

Mrs. Elsie Hafner, who went from the home of Mrs. Rose to Mrs. Morganthal's residence, testified that she came to this home about 1:20. That later the defendant came in, thereafter the phone rang and he answered it. She says that the phone was answered at about 2:00, ten minutes after the defendant came in. She fixes the time of his arrival by having looked at a clock. The defendant says that the phone rang twice. First, about five minutes after his arrival. The second time in about ten minutes. From this it is argued that if the prosecuting witness called within five minutes after the attack, as she says, inasmuch as defendant had been at the Morganthal home for ten minutes before the call, he could not have been at her home at the time she claims she was attacked.

Further, upon the defense of alibi two witnesses support the statement of the defendant that he left the Westwood Tavern on the west side of Dayton at about 1:35 P. M. One of these witnesses, Ruth Eileen Britton, a waitress at the Tavern, who was not on duty, fixes the time when the defendant came in at a little after one o'clock and said that she just happened to look up at the clock when she came in. The other, George Lewis, a dispatcher for the Yellow Cab Co., with whom the defendant formerly worked, fixes the time when the defendant came into the Tavern at 1:00 to 1:05 P. M. This witness said that he arrived at the Tavern at 1:00 to 1:05 P. M. He said in chief, that he had an appointment at 2:00 at the Hudson Park Cafe, on cross-examination at 1:15; that he met this appointment and came back at about 1:25 to 1:30; that the defendant was there; that they had a final drink together; that the defendant left in not more than five or six minutes.

From this testimony as to the time of the telephone call which defendant answered, and the time when it is testified that the defendant left Westwood Tavern, it is urged that the alibi is supported to the extent that the defendant could not properly be found guilty of the charge against him by the requisite degree of proof.

Of course, if the defendant was at the Westwood Tavern from a little after one until 1:35 he could not have been at Mrs. Rose's home at 1:30, but if he reached the Morganthal home at 1:50, as fixed by Mrs. Hafner, he could have been at the Rose home at about that time. He may not have been at the Tavern at 1:30, or at any time, for that matter. It is testified that he did not mention to the Police that he

had been at the Tavern, but said that he had been at a place known as Bezenies. The witnesses who fixed the time may have been mistaken as to the date that defendant was at the Tavern; if correct as to the date, may have erred in fixing the time of day. It may be significant that defendant says he had lunch just before going to the Tavern. It may be that, if he went there at all, he went there sooner than his witnesses say and from there to the Rose home. It is testified by the Municipal Court Reporter that the defendant stated that he went from the Rose home to the Morganthal home.

It is also notable that all of the events material to the issue occurred between one and two o'clock P. M. and the judges could well have concluded that the statements of the witnesses who sought to support the alibi did not discredit the version of the attack as testified by the prosecuting witness.

Manifestly, the weakness in the contention of the defendant as to the telephone calls is in the attempt to treat as a finality and with exactness the time when the respective witnesses say the calls from the prosecuting witness were placed and received. She did not attempt to be exact other than by the expression of an opinion. She had no means of definitely fixing the time. Mrs. Hafner undertakes to be exact by stating that she looked at a clock when the defendant came into the Morganthal home, as does Miss Britton when she came into the Westwood Tavern, and that it was ten minutes after that time when the phone rang. Assuming that this is true, which the jury may or may not have accepted, it is not conclusive that the defendant was not at the home of the prosecuting witness when the attack occurred. The distance from the Rose home to the Morganthal residence is one and seven-tenths miles by one route, with three traffic lights, and two miles by another route with no traffic lights. If defendant, immediately after the attack, went hurriedly to the Morganthal home it would be only a matter of a few minutes until he arrived. Mr. Lewis, one of the defense witnesses, said that he drove ten squares in three minutes. It is approximately that distance from the Rose residence to the Morganthal home.

A difference of a few minutes in the estimate of time would be consistent with the truthfulness of all the witnesses who testify respecting the telephone conversation. For instance, if it was ten minutes after the attack before the prosecuting witness placed her call and reached the defendant at the Morganthal home, and he had been there but five minutes,

instead of the ten as testified, before the call came in, all of the testimony as to the 'phone calls could be reconciled. Under the physical facts here appearing it is not at all unlikely that such a minor variation in the fixing of time should occur. Recognizing the fallibility of an attempt upon opinion only to be exact in fixing the time when an event occurred, it is not at all unreasonable to believe that the statement of the prosecuting witness is true as to the occurrence of the attack, even though she may be mistaken as to the exact time when it occurred.

Appellant's brief stresses several other aspects of the testimony which it is claimed refute the statement of the prosecuting witness.

It is urged that although Mrs. Rose testified that she screamed three times no neighbor heard her although they were living in close proximity to her. It appears that the doors in the Rose home were closed and she also testifies that the defendant placed his hand over her nose and mouth to the extent that she could not breathe at times. This testimony, tending to establish that had she screamed she would have been heard, is negative and must be accepted in the light of all the facts connected therewith. It is admitted that the defendant was at the home of Mrs. Rose on the day that she claimed she was attacked, but nobody in the vicinity saw him.

It is further urged that Mrs. Rose greatly exaggerated the extent of her injuries and that she did not have the appearance of being attacked; that the bedroom where the attack was claimed to have occurred was not disarranged in any unusual manner. A motive for the theory of the defendant that the charges were falsified was sought to be established in that he states some eleven years before the attack he observed the prosecuting witness in a compromising situation and that when he accosted her she then threatened to get even with him.

We have considered these claims and all others appearing in the brief of appellant. As against all of these developments, intended to weaken the narrative of the prosecuting witness and to support the theory of the defense, there is not only the testimony of the prosecuting witness but strong corroborative facts and circumstances. She gave a definite and connected account of the attack. It appears that following the attack she was hysterical and in great mental distress. This is supported by Mr. and Mrs. Hafner that when they saw her she had been crying. Sergeant Eichelberger testified that her hair was disheveled, that her face

was swollen, that it was difficult for her to talk clearly, and that the bedroom was bardly torn up. She reported the attack promptly and named the defendant as the assailant to Mr. Hafner when she was unsuccessful in reaching Mrs. Hafner. She is corroborated in her statement that the defendant answered the phone at the Morganthal home when she called there. She is corroborated almost completely by her husband as to the extent of her injuries and in the main by Sergeant Eichelberger, insofar as he could observe, when she was clothed. The hospital records support the contention as to the injuries as to her thighs and in part as to her face.

Supporting the theory of an attack was the presence of a milky liquid on the floor in the bedroom where the attack occurred. After it dried it was analyzed and found to contain dead spermatozoa. The prosecuting witness says that this liquid was not at the place where the attack occurred. Defendant urges that it is significant that none of the semen was found on the clothing of Mrs. Rose or the defendant.

The testimony of the defendant does not give the assurance that it was truthful in all particulars in connection with his earlier statements made to the police. To them he denied that he had been at the Rose home. To them he said nothing about being at the Westwood Tavern. At the trial this testimony was the very core of his defense of alibi. At the trial he said that he went from the Westwood Tavern to the Morganthal home by way of Hafner's. To the police he said that he went to the Morganthal home from the Rose residence. To the police he was not committal as to the time of his movements on the date in question. At the trial he was specific as to the places and dates and time, particularly respecting the telephone call. Although he denied any attack, Sergeant Eichelberger testified that he said that "he couldn't even think of admitting anything about a rape as he was a soldier of the United States and that it was a crime punishable by death under Military Rule and he couldn't entertain a thought of rape and wondered what she (Mrs. Rose) would say with regard to an assault charge."

All of these facts, and others which appear in the record, presented a situation from which the triers of the facts, three experienced jurists, could very properly have found, as they did find, that the State had established its case by the requisite degree of proof, and that the testimony tending to support the alibi of the defendant did not raise any reasonable doubt as to the guilt of the defendant.

The very early case of **Bresse v. State, 12 Oh St 146,** states the rule controlling reviewing courts as to the reversal of a criminal judgment in the 4th syllabus:

"A judgment will not be reversed because the verdict is contrary to the evidence, unless it is manifestly so, and the reviewing court will always hesitate to do so where the doubts of its propriety arise out of a conflict in oral testimony."

Appellate cites **State v. Petro, 148 Oh St 474,** for the proposition that even the Supreme Court "would examine the record in a criminal case to determine its proof beyond reasonable doubt." This, of course, does not imply that where there is evidence which is probative of guilt beyond reasonable doubt that the Supreme Court will reverse a conviction. The 11th syllabus does not so hold.

The obligation of an appellate court in a review of a criminal case is well restated by Judge Turner at page 501 of the late opinion, supra.

"It is the minds of the jurors and not the minds of the judges of an appellate court that are to be convinced. The jurors see the witnesses and observe their demeanor. The credibility to be given to each and all of these witnesses and to part or all of their respective testimony is for the jury. The question to be determined by an appellate court is: Does the record contain evidence from which a jury would be justified in concluding that the accused was guilty beyond a reasonable doubt?"

Judge Turner concludes as we do in this case:

"We are of the opinion that there was direct and circumstantial evidence before the jury which, if believed, was sufficient to convince the minds of the jurors of the guilt of defendant beyond reasonable doubt."

Here the three judges were acting as jurors to determine and weigh the facts.

We find that no error prejudicial to the rights of the defendant intervened in the trial of this case in any of the particulars asserted.

The judgment will be affirmed.

MILLER, PJ, and WISEMAN, J, concur.